Durfee, Judge,
delivered the opinion of the court:
This is an action for breach of plaintiff’s contract of enlistment in the United States Marine Corps under date of March 20, 1953. The breach alleged is the claimed failure to accord plaintiff a hearing as required by the Career Compensation Act of 1949. Plaintiff was separated from the service administratively by an honorable discharge on October 28, 1953, for “antisocial personality.” Plaintiff says *360 that this is a physical disability within the meaning of the provisions of the 1949 Act, requiring a full and fair hearing before discharge thereunder. Plaintiff claims the pay and allowances he would have received during the period from the date of his discharge through March 20, 1959, when his six-year contract of enlistment would have expired, in an amount claimed at $25,000, with interest to date of judgment.
The question presented is whether the action taken by the Secretary of the Navy in administratively discharging plaintiff was an arbitrary act and contrary to law.
After an unhappy home life as a boy, and an unsatisfactory adjustment to school, plaintiff enlisted in the Marine Corps for three years at the age of 17. He was honorably discharged eight months before his enlistment expired, for the convenience of the Government, and immediately reenlisted for six years. His medical record at this time showed a normal psychiatric condition. His subsequent record indicates a long series of difficulties — repeated absence without leave; failure to obey orders; and other misconduct culminating in his being placed in a hospital for psychiatric observation. The psychiatrist who examined plaintiff at that time concluded:
Patient seems to have an extremely paranoid antisocial personality, and it seems to me that he could best be handled by an administrative discharge by reason of unfitness. He is hostile, aggressive, uncooperative, paranoid, and has a rapid stream of thought and speech. Should be given a trial on an open ward with above recommendation in mind.
After several days in an open ward, during which plaintiff acted in an eccentric and very disturbed manner, including absence from the hospital for two days without leave, plaintiff appeared before the Board of Medical Survey, which determined that plaintiff should be discharged administratively for “antisocial personality.” The Board also found that this condition existed prior to enlistment, that it was not the result of or aggravated by service conditions, and that plaintiff was not fit for military duty.
Plaintiff made no application for retirement for disability and has made no application to the Board for Correction of Naval Records. He took no steps to challenge his discharge *361 until be started this action on September 3,1958. This court has consistently held that before a person can bring suit in this court for disability retired pay, he must first exhaust his administrative remedy of applying to a Eetiring Board, or Physical Evaluation Board for an administrative determination :of his right to retirement for physical disability. This is not a permissive remedy; it is mandatory, in the absence of extenuating circumstances. Furlong v. United States, 138 Ct. Cl. 843. Although plaintiff’s petition might have been dismissed on this ground, defendant did not urge this point, and we will proceed to dispose of this case on the merits.
After his discharge in 1953, plaintiff-was forcibly committed to a Veterans Hospital in 1958, following threats to kill himself and his wife, and other highly irrational conduct. The diagnosis was “schizophrenic reaction, catatonic type,” and he was found to be “incompetent.”
Plaintiff was discharged under the authority of instruction 1910.2 of the Bureau of Medicine and Surgery and paragraph 10271 of the Marine Corps Manual. The purpose of the instruction is stated:
1. Purpose. To promulgate standards and procedures for the separation of subject members from the Naval Service who have become functionally incapable of performing useful service.
Paragraph 3 of the instruction states:
3. General. Members of the Naval Service may be found unfit for military service by reason of physical disability due to disease and also injury because of inherent pre-existing defects which constitute military unfitness as distinguished from physical disability.
Paragraph 6a lists 19 conditions, including antisocial personality, which constitute a basis for administrative discharge of those not suitable for military service because of medical conditions not constituting physical disability. Boards of medical survey are instructed to submit reports on such individuals, except when medical board action is indicated as in the case of defects which are not inherent and which do not pre-exist military service, but which are the result of disease or injury and which are incapacitating *362 so as to warrant retirement or separation for physical disability.
Paragraph 6c provides, in part:
c. Authority to Discharge. * * * and commanding generals and commanding officers Marine Corps activities CLUSA are hereby authorized to discharge enlisted or inducted members, * * * of the Marine Corps or Marine Corps Keserve, on active duty, when discharge for one of the conditions listed in paragraph 6a is recommended; provided: * * *
(3) The member concerned indicates in writing that he has been informed of the findings and does not desire to submit a statement in rebuttal.
The Board stated in its record that plaintiff had been informed of the findings and did not desire to submit a statement in rebuttal. Although there is no written statement to this effect signed by plaintiff, he admits that he signed something at the time. However, plaintiff admits that the discharge was in accord with the applicable naval regulations and directives. His position is that the regulations and directives are invalid by reason of their erroneous construction of the words “physical disability” as used in Section 413 of the Career Compensation Act of 1949, the effect of which has been to deprive plaintiff of a hearing before discharge.
Section 413 of the Career Compensation Act of 1949, 37 U.S.C. § 283, provides as follows:
§ 283. Regulations.
The Secretary concerned shall prescribe regulations for the administration of this subchapter within his department or agency, including regulations which shall provide that no member of the uniformed services shall be separated or retired for physical disability without a full and fair hearing if such member shall demand it.
The regulations adopted in compliance with this section (32 C.F.K. Part 725) provided for the appointment by designated authorities of medical boards and physical evaluation boards. The medical boards were to consider cases referred to them by . competent authority to determine whether the member -so referred was or might be sufficiently unfit to perform the duties of his office or rank so as to warrant presenting the case to a Physical Evaluation Board *363 for retirement or separation. Upon notice to tbe member, a bearing was to be conducted before tbe Physical Evaluation Board. The member of tbe service involved was given adequate procedural protection under tbe regulations including tbe right to appear in person and by counsel, to offer evidence, and to cross-examine. After hearing, the Physical Evaluation Board was required to find whether the member was fit or unfit, and if unfit, whether such unfitness was or was not by reason of physical disability. In this connection physical disability was defined as “any impairment of physical or mental function which is the result of a disease or injury” [Emphasis supplied.]
Plaintiff contends that he was suffering from “paranoid schizophrenia,” which is a physical disability, rather than “antisocial personality,” which, under defendant’s construction as the cause of his discharge, is not a physical disability. Plaintiff contends that under proper construction of Title IV of the Career Compensation Act, psychosis and psychoneurosis on the one hand and personality disorders stated as “antisocial personality” as the reason for his discharge on the other hand, are “physical disabilities” within the meaning of this phrase as used in § 413 of the Career Compensation Act. Accordingly plaintiff asserts that he was entitled to a hearing and determination under the regulations promulgated under this section.
Plaintiff further alleges that he was actually and in fact discharged as unfit by reason of “physical disability” in the correct sense of this term, upon an invalid finding of unfitness by the Medical Survey Board, and without a full and fair hearing to which he was entitled under § 413, and that this action was a breach of his enlistment contract for which he is entitled to damages.
Much expert testimony by qualified psychiatrists was offered by both parties at the trial as to whether plaintiff was suffering from a physical disability at the time of his discharge. This is reviewed at length in our findings, from which it is apparent that there is a clear conflict of expert opinion. However, we are not now called upon to resolve this conflict in order to decide this case.
There is substantial evidence in the form of expert medical *364 testimony to support the conclusion of the Medical Survey Board which found plaintiff unfit for military service because of “antisocial personality” and not physical disability as the cause for his honorable discharge. The Board was not arbitrary, capricious, or acting contrary to law in reaching the conclusion that plaintiff’s condition was not a physical disability within the meaning of the pertinent law and regulations. We therefore conclude that plaintiff was lawfully discharged and that there was no breach of his enlistment contract thereby.
Judgment will be entered for defendant, and plaintiff’s petition is dismissed.
It is so ordered.
Davis, Judge; Laramore, Judge; Whitaker, Judge; and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. The petition in this case asserts a breach of plaintiff’s contract of enlistment in the United States Marine Corps under date of March 20, 1953. The breach alleged is the claimed failure to accord plaintiff a hearing as required by the Career Compensation Act of 1949. Plaintiff was separated from the service administratively by an honorable discharge on October 28, 1953, for “antisocial personality.” Plaintiff says that this is a physical disability within the meaning of the provision of the act requiring a full and fair hearing before discharge therefor. Plaintiff claims $25,000 as the pay and allowances he would have received during the period from the date of his discharge through March 20, 1959, when his contract of enlistment would have expired, with interest to date of judgment.
2. Plaintiff was bom in St. Johnsbury, Vermont, November 22, 1933. His parents separated when he was about 3 years of age. His family history indicates that in childhood he was shifted from paternal to maternal relatives, spending time in between with his mother and father. The latter did not accept him and the lack of stable home rela- *365 tionsbips fallowed its effect in plaintiff’s feelings of insecurity and inadequacy.
3. The School Social Work Department of the Hartford, Connecticut, Board of Education noted, in part, the following with reference to plaintiff’s conduct in the fifth grade:
In grade 5 at the Bums School his conduct was such that he was described as mischievous, and as having poor work habits. * * * At this time Eichard manifested considerable difficulty in getting along with other children, expressed a fear of them and continually complained that he was being teased and picked on. * * *
4. Plaintiff testified that he did not like other children and did not like to “hang around” with them. He had frequent fights. He ran away from home. He understood that he was illegitimate and that his family did not like him for this reason. He testified that his father was an alcoholic and beat him with a leather belt and that his mother was overstrict in her discipline.
5. On April 26, 1949, plaintiff was given individual intelligence and personality tests by the Hartford schools to determine his mental ability and reasons for his maladjustment in school. The tests showed him to be of average intelligence but seriously disturbed and in need of therapy which his parents did not provide. The report of the school psychologist who administered the tests states that plaintiff gave the impression of an extremely confused boy, was disturbed about being tested, showed marked signs of blocking, appeared to function best in a solitary and nonverbal situation and showed an obvious inhibitive quality in his responses. The examiner found that although he lacked poise he showed considerable personal warmth. Among other observations the examiner recommended individual counseling to help plaintiff work through his emotional problems. Plaintiff’s sense of frustration from continued failures was said to be irritating to him although he had a potential for achievement.
6. Plaintiff felt that he had to get away from home where he was unhappy and abused, so he quit school in October 1950 to work briefly in a filling station. He then accepted his mother’s suggestion of the military service as a way of *366 making something of himself, and he enlisted in the United States Marine Corps for 3 years on his 17th birthday, November 22,1950. He was discharged “for the convenience of the Government” on March 20,1953, and immediately reenlisted for 6 years “unless sooner discharged by proper authority.” His medical record at this time showed a normal psychiatric condition. He was honorably discharged, as heretofore noted, on October 28,1953.
7. Plaintiff was discharged under the authority of instruction 1910.2 of the Bureau of Medicine and Surgery and paragraph 10271 of the Marine Corps Manual. The purpose of the instruction is stated:
1. Purpose. To promulgate standards and procedures for the separation of subject members from the Naval Service who have become functionally incapable of performing useful service.
Paragraph 3 of the instruction states:
3. General. Members of the Naval Service may be found unfit for military service by reason of physical disability due to disease and also injury or because of inherent pre-existing defects which constitute military unfitness as distinguished from physical disability.
Paragraph 6a lists 19 conditions, including antisocial personality, which constitute a basis for administrative discharge of those not suitable for military service because of medical conditions not constituting physical disability. Boards of medical survey are instructed to submit reports on such individuals, except when medical board action is indicated as in the case of defects which are not inherent and which do not pre-exist military service, but which are the result of disease or injury and which are incapacitating so as to warrant retirement or separation for physical disability.
Paragraph 6c provides, in part:
c. Authority to Discharge. * * * and commanding generals and commanding officers Marine Corps activities clusa are hereby authorized to discharge enlisted or inducted members, * * * of the Marine Corps or Marine Corps Reserve, on active duty, when discharge for one of the conditions listed in paragraph 6a is recommended; provided: * * *
*367 (8) The member concerned indicates in writing that he has been informed of the findings and does not desire to submit a statement in rebuttal.
8. The statement of the Board of Medical Survey, dated September 22, 1953, in evidence, states in part that it is the opinion of the board that the diagnosis of antisocial personality in plaintiff’s case is correct, that it existed prior to enlistment, is not the result of or aggravated by service conditions, that plaintiff is not fit for military duty and should be discharged and that:
The patient has been informed of the findings of the Board and does not desire to submit a statement in rebuttal.
There is not in evidence any written statement by plaintiff that he had been informed of the findings and did not desire to submit a rebuttal. However, plaintiff admits that the discharge was in accord with applicable naval regulations and directives and that plaintiff signed something at the time. He does not know what it was. As heretofore noted, it is plaintiff’s position that the regulations and directives are invalid by reason of their erroneous construction of the words “physical disability” as used in section 413 of the Career Compensation Act of 1949, the effect of which has been to deprive plaintiff of a hearing before discharge
9. Plaintiff has made no application for retirement or disability, although he discussed it with medical officers to whom he admitted that he was “antisocial.” Plaintiff has made no application to the Board for Correction of Naval Records. Plaintiff’s appearance was before the Board of Medical Survey. He admitted to the board that he had trouble all of his life in getting along with people but felt he had been framed in being sent to the hospital. He recounted to the board various of his past behavior difficulties, dating from childhood, which led eventually to his being locked in a neuropsychiatric ward for observation by defendant. After discharge he went home to his mother. There followed numerous jobs which he held only briefly. Plaintiff testified that he was fired from some jobs and quit others because people thought from his conversation and conduct that he was “a nut or something.” He also found it difficult to *368 concentrate. He could not get to work on time because he was obsessed with writing a play about his experiences.
10. Plaintiff’s military service was all in the United States. His record indicates a long series of difficulties, summarized as follows:
On December 26,1950, plaintiff was warned for smoking in an unauthorized place.
In December 1951 plaintiff was AWOL for 2 days during which he was involved in an automobile accident. He received 2 weeks’ extra duty as punishment.
On April 15, 1952, he was given a summary court-martial for being AWOL, disobeying orders and breaking restrictions. He was given 2 weeks’ restriction for “dereliction in the performance of his duties.”
On April 23, 1952, plaintiff was charged with three violations of the Uniform Code of Military Justice in that he lied to an officer, failed to obey a lawful order and was insubordinate.
On May 28, 1952, he again was charged with violation of Article 92, Uniform Code of Military Justice, being. derelict in the performance of his duties. He was given 2 weeks’ restriction.
_ On August 8, 1952, plaintiff, who had been AWOL since July 7, was declared a deserter. On August Id, 1952, he was apprehended and surrendered.
On August 15, 1952, he was again absent without authority. He surrendered on September 25, 1952. A special court-martial was approved. It was determined he was not a deserter but had an unauthorized absence for which he was fined $250, reduced in rank and confined for 5 months. He claimed the prison guards beat him for believing in God.
On December 8, 1952, plaintiff was given extra duty for sleeping after reveille and being disrespectful to a sentry.
On July 21,1953, he was again given nonjudicial punishment of 2 weeks’ extra duty for unauthorized absence.
In August and October 1953 he again was AWOL.
11. While stationed at McAlester, Oklahoma, in July 1953, plaintiff purchased a Colt .45 pistol with 47 rounds of ammunition from W. C. Hunter, a master sergeant. Plaintiff was a rifleman, thought he was going overseas, and wanted a pistol like General Patton had. He was transferred during that month to Camp Pendleton, California. While on libei’ty there he left his Colt and ammunition *369 with a friend. A Bowie knife, which, he also owned, was left in his suitcase. Upon his return he found the knife missing. His executive officer gave plaintiff a week’s restriction for returning late from liberty. Anger over loss of the knife was directed toward the commanding officer, or at least the officer thought so, and plaintiff suffered an additional week’s restriction. There followed a series of events pertaining to plaintiff’s possession of the weapon in question and plaintiff’s desire and efforts to turn it in to the armory for safekeeping. It was finally registered at the post provost marshal’s office on August 12, 1953. Prior to the latter date, company officers searched plaintiff’s effects for other weapons. On August 19, 1953, plaintiff sold his Colt to a Corporal Spaulding.
12. Although he was on restriction, plaintiff was given special liberty to go to Oceanside, California, outside the base, to pick up some of his clothing, in preparation for a general inspection. Spaulding lived off the base with his wife, and it was agreed that plaintiff would be transported by Spaulding. Spaulding got permission to pick up the pistol at the office of the provost marshal and take it to his home. Plaintiff went along and got his clothes as planned. The two men then stopped at a bar for a drink at about 7 p.m., having 2 hours of unused liberty. They picked up some women and encountered a first lieutenant who asked where he might find a woman. They agreed to assist him and all went to another bar. Here they ran into Lieutenant O’Eourke, plaintiff’s commanding officer, who asked plaintiff what he was doing in the bar as he was only supposed to have gone to get his clothes. Plaintiff was ordered to return to the base. Words were exchanged. The lieutenant, who accompanied plaintiff, agreed to return him to the base by 9 p.m, and he did assist him in that direction.
13. On the following morning, August 20,1953, a sergeant was ordered to watch plaintiff, who a little later was ordered into the hospital and put in a psychiatric ward. Plaintiff testified that he heard Lieutenant O’Rourke talking to the doctor at the hospital and that he was told in the sick bay he was a “potential murderer” and that he “had a gun, ammunition and knife and might kill people.” On this date *370 a medical corps lieutenant, O. C. Irion, noted the following on plaintiff’s medical record:
Diagnosis: ntr [Diagnosis Unknown] (aNxiett reac-tiost) # 7955.
This man has been in trouble on numerous occasions. He served a term at Portsmouth, and at present is on restriction.
He has threatened to kill some people in his outfit, and a .45 with ammunition and a knife were taken from him. His behavior has been peculiar and actions unusual. He is being admitted for Psychiatric Observation. He also complains of back pain which was under investigation by the Orthopedic Clinic. * * *
Transferred this date to tjsnh Camp Pendleton, Calif., for treatment and disposition.
Plaintiff denies having made the alleged threats. There is no evidence that the alleged threats were ever actually made the subject of any investigation or determination. Accordingly, there is no evidence before the court on the basis of which it can be found that the threats were in fact made. It is found that this episode, if it did occur, is not characteristic of either antisocial personality, a personality disorder, or paranoia schizophrenia, a psychosis, and thus is not useful to the court in determining which, if either, condition plaintiff has had. The alleged threats, however, were accepted as a fact by defendant’s medical officers referred to in findings 8 and 9 who recommended plaintiff’s discharge.
14. The following entry of August 21, 1953, made at the hospital by a psychiatrist who interviewed plaintiff, appears on his medical record:
[Plaintiff] states that he has had trouble getting along with people all his life. Eecently he has become perturbed at the USMC and has had a series of minor offenses which ended up with his threatening various persons in his outfit. He was later found with a loaded .45 and knife in his possession which the [plaintiff] states he was about to turn in to proper authorities. He feels that he was “framed” into being sent here. This has been a characteristic of his USMC adjustment, feeling that everyone is picking on him and making unjustified trouble for him. He has had two courts martial both of which he felt were unjustified. Has had office hours ten or eleven times. *371 He also has what is probably a psychogenic musculo-skeletal reaction, backache.
*****
Patient seems to have an extremely paranoid antisocial Eersonality, and it seems to me that he could best be andled by an administrative discharge by reason of unfitness. He is hostile, aggressive, uncooperative, paranoid, and has a rapid stream of thought and speech. Should be given a trial on an open ward with above recommendation in mind.
15.Plaintiff was permitted to return to an open ward. On August 22, 1953, the medical record carries the following notation:
Patient seen today and for 1% hours talked very rapidly, pouring out experiences in which he feels he has been pushed around; the chief one seems to be. resentment towards a Lt. in his outfit who asked him [to] leave an officer’s club. He agreed to stay in the hospital over the week-end. Is ambivalent about the USMC — thinks it was and is potentially a great outfit, but that it’s lately been ruined. Although he is very sick it might ruin any chances of therapy to transfer him right back to a locked ward, so I think it’s worth the risk to see how he gets along over the weekend.
During course of talk today, [patient] said his legal father was an orchestra leader,, but that actually his father was a man who seduced his mother; she was then divorced by her husband, and remarried (not pt’s. father) . Feels he never got along well with his mother, because he looks like his real father. Talked about resentments of mother and sister — she always seemed to be trying to get him into trouble.
16.Plaintiff left the hospital for 2 days and wandered around Los Angeles. He thought that for leaving the hospital he would be brought up for disciplinary action and would be able to tell his version of the gun and knife episode. Upon his return to the base, however; he was permitted to return to the hospital alone.
17.There are these following notations on plaintiff’s medical record at the hospital:
8-%Jf-58 Today patient is much steadier, talks more slowly and coherently and with more appropriate facial *372 expression. “It boils down to my feeling that everybody’s picking on me.”
8-25-53 Today his talk is coherent, but he complains of getting shaken when the ward M.A.’s tell him what to do. Yesterday, he seemed to be talking to himself while in bed, and last night he missed the eleven P.M. bed check. Transferred again to locked ward, in spite of his protests.
8-26-53 At first stated he wanted to be left alone, and then began monologue on what’s wrong with the world, ending conference by asking me to read “Man Without a Country.”
8-31-53 Still pours out monologue about what’s wrong with things — speaks rapidly, jumping from topic to topic.
18. There followed the appearance before the Board of Medical Survey, referred to in findings 8 and 9, and its determination that plaintiff should be discharged administratively for antisocial personality. Plaintiff testified at the trial in this court that pending appearance before the board he was confined naked in a room and laughed at. He also claims the medical officers told him that he was not a schizophrenic so they could, describe his condition with the language which they did use, and that he was told further that when he went before the board he should admit he was antisocial because otherwise he would be fighting his case for the next 5 years from a hospital in San Francisco. He testified, further, that he was told that if the board did not believe him he would “get a shot in the rear,” and be put in a straitjacket to be flown to San Francisco and get shock treatment. He also testified that a Dr. Young or a Dr. Ziegler told him that he could get 10 percent disability on an unnamed basis, but he was not told about physical evaluation boards. Plaintiff, however, preferred to go to the Veterans Administration. He claims the Veterans Administration in New York thereafter laughed at him. None of these assertions were rebutted. The plaintiff did not identify defendant’s representatives who allegedly told him most of these things. It is found that the evidence thereon is thus self-serving, inconclusive and entitled to little weight. Plaintiff decided not to fight his discharge and did not.
19. In 1957, while working in a restaurant, plaintiff met *373 Judith Prasldn. On August 10, 1957, they were married. On April 5, 1958, an only son, Michael James McAulay, was born to plaintiff and his wife. When plaintiff learned that his wife was pregnant and he had to find a steady job, he became depressed, could not sleep, niched his wrists in a suicidal gesture, and threatened to jump into the river. He had grandiose ideas. Once he threatened to hill his wife in order to get attention and recognition and become famous. He once c'hohed her until she fainted. He claimed that he was God and could mahe light and had the power of life in his hand, was greater than Hitler, etc. His wife and attorney arranged for his forcible commitment to the Veterans Administration Hospital, Perry Point, Maryland, on the certificate of two doctors in August 1958.
29. The hospital admission note written by Dr. L. Kajdi on August 20, 1958, stated: “Impression: Schizophrenic reaction, catatonic type.” The history of plaintiff’s instability since childhood was recounted. On August 21, 1958, Dr. J. C. Grasberger had a preliminary conference with plaintiff and recorded the following comment:
This 24 year old, married, NSC man was discharged from the Marine Corps because of antisocial personality. He has always been a rather immature and unstable individual but recently since his wife became pregnant and gave birth, his behavior and ideation has been becoming more bizarre. He developed grandiose ideas, stating that at various times he was a great actor, a great play writer and even God himself. At the present time he is quite psychotic, talking grandiosely about his greatness as an actor and play writer. He is quite over active, has had little necessity for sleep and has lost considerable weight recently.
impbessioN: Schizophrenic reaction, schizo-affective type — INCOMPETENT.
Dr. S. P. Lacerva, also of the Veterans Administration hospital staff, prepared a consultation report dated September 2, 1958, noting the provisional diagnosis made by Dr. Grasberger and stating in part his own impression that plaintiff was “a very verbose antisocial personality who has great aspirations of being an actor, and identifies himself with the late James Dean. He tells of being involved in *374 various street brawls and also tliat be is going to write an autobiography.”
21. The interim summary by Dr. Grasberger on August 25,1958, made the following diagnosis:
Schizophrenic reaction, chronic undifferentiated type, moderate.
External Precipitating Stress: Moderate, increased responsibilities of marriage and birth of child.
Predisposition: Severe, previous hospitalization for psychiatric disorder.
Degree of Impairment: Severe. _
_ The psychosis is in partial remission and the patient is competent.
22. On September 2, 1958, plaintiff was given a 15-day leave of absence from the hospital. After plaintiff left, his lawyer informed the hospital that plaintiff was not taking his medicine and that it looked as though he would have to return. Subsequently, plaintiff’s wife wrote the hospital that plaintiff was working regularly on a construction job and doing fairly well. Plaintiff was discharged from the hospital on October 8. The hospital’s final summary, dated October 13, by Dr. Grasberger, repeated the diagnosis of the interim summary, except that it stated that the degree of impairment was “mild” and said that plaintiff was “incompetent.”
23. Following his release from the hospital, plaintiff and his wife stayed briefly in the Baltimore home of his lawyer, and plaintiff obtained a job on a construction project nearby. He got into an argument with his supervisors, however, and quit this job to return to New York and continue his former pattern of life in which he held down odd jobs while attempting to obtain positions as an actor and prominence as a writer. For instance, he testified that he sold a play, entitled “awol”, based on his experiences in the brig at Quantico, Virginia. He received $200 for this with the promise of more from profits, if any. He also acted in a movie, entitled “Bad”, and received $35 per week therefor, the first money he actually ever earned as an actor. At the time of the trial he was expecting to play in a picture called “Bock and Boll Monster” for which he was to be paid $200.
24. On September 22,1958, at the request of Dr. Manfred *375 S. Guttmacher, a psychiatrist of Baltimore, plaintiff was examined by Dr. Benjamin Pope for the purpose of a differential diagnosis between antisocial personality and paranoid schizophrenic reaction. Dr. Pope is a clinical psychologist who is Director of Psychological Services at the Psychiatric Institute of the University of Maryland Hospital in Baltimore and an Associate Professor of Medical Psychology at the University of Maryland Medical School. Dr. Pope offered a diagnosis of chronic schizophrenic reaction with a paranoid emphasis of moderate intensity. He noted such features in plaintiff’s behavior and personality as inappropriate speed and unintelligibility in his speech, obsessive perseverance with problems alternating with wandering off on tangents, anxious preoccupation, autistic confusion and concrete literal interpretation of words, delusional trends in thinking along paranoid lines, grandiose perceptions, morbid obsession with death, considerable anxiety, poor impulse control, extremely low self-esteem, coupled with hypersensitivity, self-contradictory image of self, immaturity and regressive dependency needs and a tendency to lose contact with another person to whom he was talking. Dr. Pope noted that the patient’s history showed antisocial behavior and that his psychological examination was consistent with this history. Outbursts of such behavior, he said, were because of the paranoid features of plaintiff’s personality. He said that the major area of conflict and source of plaintiff’s anxiety was that of sexual adjustment. Dr. Pope noted that there was enough that was healthy in plaintiff to suggest some potential for growth and adaptation with protracted treatment, direction and training, but said, also, there would be periods in plaintiff’s life when he would need the protection of an institution.
25. To assist the court in resolving the issues posed by the pleadings, the parties offered the testimony of two qualified medical experts. Dr. Manfred S. Guttmacher, Baltimore, Maryland, testified for plaintiff. Guttmacher is chief medical officer of the Supreme Bench of Baltimore City, Assistant Professor of Psychiatry at Johns Hopkins University Medical School, of which school he is a graduate, Associate Professor of Psychiatry at the University of Maryland Medical School, and also practices privately. He has studied *376 both in the United States and abroad. During World War II he was in the Army Medical Corps, Psychiatric Consultation Service. During the Korean War he was sent by the Army Surgeon General as a civilian consultant to Korea for two months.
Testifying for the defendant was Commander Thomas H. Lewis, Medical Corps, United States Navy, Administrative Psychiatrist, U.S. Naval Medical Center, Bethesda, Maryland. A graduate of Duke University School of Medicine he practiced privately, has had training in naval hospitals and was chief of psychiatry at the naval hospital in Corona, California. He is an instructor in psychiatry at Georgetown University Medical School. He is a member of various professional associations.
26. It was the opinion of Dr. Guttmacher that an antisocial personality is one of a large group known as character or personality disorders or psychopathies. Antisocial personalities are people who are in constant conflict with authority although without any real focus. They have been described as “rebels without a cause.” Due to a warped character structure they are incapable of adjusting themselves to the requirements of society whether in civilian life or in the Armed Forces. The early history of an antisocial personality is likely to show a consistent pattern of minor skirmishes with society, starting at an early age with rebellion against school discipline. These personalities have no loyalties to any person, group or code.
27. Characteristics which mark antisocial personalities are aggression, hostility and apparent incapacity to learn by experience. It is difficult to appeal to them by admonitions or promises of reward or punishment. Lack of a criminal record is unusual in an antisocial personality. These people just do not stay in line, do not fit and are constantly feeling they are not being given the proper consideration. They are often “smart alecks” and egocentrics. Dr. Guttmacher said that they show a constant streak of insubordination. They are not team-players, are irresponsible and cannot be relied upon to carry out routine orders. The military has found it not worthwhile to try to fit such people into the service. Cases of antisocial personality range from mild to severe. *377 When it comes to inducting men for military service, because of the large number who must be processed, it is impossible effectively to screen out all who are destined for mental deterioration. Some are inducted with pre-existing disorders which are manifested later.
28. The cause of antisocial personality is not agreed upon. A minority view is that it is a congenital defect, some abnormality of the nervous system or brain which has not yet been detected by microscope or electro-encephalogram. The general view, held most plausible by Guttmacher, is that the very early formative years, the first 3 or 4, are largely responsible. Some families show one such person among half a dozen normal members and it is not always possible! to account for this when the environment has been the same. But, the attitude of parents towards children sometimes differs and individuals are subjected to injurious circumstances which seem minimal when they occur but which may be of great importance in character formation.
29. The Joint Armed Forces Nomenclature and Method of Becording Psychiatric Conditions, issued in 1949, defines “character and behavior disorders” as follows:
Such disorders are characterized by developmental defects or pathological trends in the personality structure, with minimal subjective anxiety, and little or no sense of distress. In most instances, the disorder is manifested by a lifelong pattern of action or behavior (“acting out”), rather than by mental or emotional symptoms. * * *
One of the “pathological personality types” which are listed as character and behavior disorders is “antisocial personality” defined as follows:
The term refers to chronically antisocial individuals who, despite a normal moral background, are always in trouble, profiting neither from experience nor punishment, and maintaining no real loyalties to any person, group, or code. Ordinarily, an individual of this type is not a calculating criminal, but one who is often on the verge of criminal conduct and may eventually become involved in such conduct. * * *
Schizophrenia, the paranoid psychosis, implies an illness incurred in or aggravated by military duty and is disposed *378 of under regulations implementing the requirements of the Career Compensation Act for a full and fair hearing, while antisocial personalities are classified as personality disorders, predating military service and for which administrative discharge is provided.
30. Dr. Lewis accepted the Joint Armed F orces description of antisocial personality as fair. He concurred with Dr. Guttmacher as to the causes of such a condition. He further agreed that such a personality is of lifelong pattern visible on proper examination, marked by difficulties in school and on the job, that it has various degrees of severity and is usually accompanied by a criminal record. He also testified that, while antisocial personalities seldom receive medical treatment, they could use it. Such a case, however, is difficult to treat successfully because of the patient’s lack of interest in the therapy. In the military such personalities are frequently referred to a military psychiatrist by legal or disciplinary sources because of behavior difficulties in the service.
31. Dr. Lewis gave it as his opinion, in agreement with Dr. Guttmacher, that antisocial personalities are disabled in significant respects from conforming to the requirements of military service, as for example, inability to accept discipline or to conform to the demands of group living and participating as a member of a team. He said, however, that antisocial personality is not usually considered to be a physical disability.
32. The expert witnesses also discussed a condition known as schizophrenia, which in early stages or under special circumstances, manifests a psychopathic or antisocial-like behavior pattern. In a given case it is difficult to tell the difference between this condition and that of antisocial personality without careful and successive diagnoses and tests over a period of time by experienced psychiatrists. Dr. Guttmacher considered that the two conditions, however, were distinct entities although surface symptoms might be similar.
33. The evidence shows that schizophrenia has several symptoms. One of these is autism which is a need for aloneness, a lack of socializing capacity. It is a group of symp *379 toms or attitudes characterized by withdrawal and self interest as distinguished from outgoing or socializing traits. Schizophrenia is also characterized by inappropriateness of emotional response, indecisiveness, delusions of grandeur, and in general, a difficulty in meeting life realistically. Other symptoms, which show themselves in speech, are blocking, verbosity, disconnected phrases and thoughts and abnormal speed or slowness, varying from time to time. Schizophrenia has roots in one’s background and is sometimes manifested by 3 years of age but usually between the ages of 15 and 25. It early shows an inability to get along with other children and a feeling that one is being picked on.
34. A variation of the above condition is paranoia schizophrenia. A paranoid schizophrenic may have feelings of persecution or a feeling that others are jealous of him or that he has abilities greater than anyone else’s but which are not recognized. Clinically such persons seem to be suspicious, overbearing and hostile, and ready to engage in battle with others. Such a condition does not inevitably require medical treatment.
Another condition, paranoid personality, differs from paranoia schizophrenia as a matter of degree, and is less severe. Paranoia, as distinguished from paranoid personality, refers to a relatively intact personality with one restricted area of distorted perceptions or delusional symptoms.
Psychiatric principles provide no difference in treatment between antisocial personality, schizophrenia and paranoia schizophrenia except on the basis of the severity of an individual case.
35. Dr. Guttmacher described another condition which he termed “pseudopsychopathic schizophrenia,” which is schizophrenia in its early stages or under special circumstances, manifesting psychopathic or antisocial behavior-like pattern rather than true schizophrenic symptoms. People who are at one time or another diagnosed as antisocial personalities are upon further development or diagnosis over a period of time found to be basically schizophrenic. The differentiation is often difficult to make. With this view Dr. Lewis *380 agreed but went further and indicated that antisocial personality can get worse and become schizophrenia. With the latter view Dr. Guttmacher did not agree.
36. The experts drew essentially the same distinctions between antisocial personality and paranoia schizophrenia. In summary, their testimony on these points is that, as a practical matter, these conditions while different do tend to merge into one another and a patient may present symptoms of multiple conditions and all one can say is that he is sick. Dr. Guttmacher, however, felt that a child with an antisocial personality was likely to be in constant difficulty because of his aggression whereas a schizophrenic child instead of fighting back “just eats his heart out” because of his situation. Stated another way, the former is characteristically bellicose while the latter is withdrawn, shy and reticent. Dr. Lewis made a further distinction between the two conditions indicating his opinion that a schizophrenic is likely to show at some point a significant difference in his behavior as a result of particular stresses whereas an antisocial personality usually remains about the same through the years but can show varying degrees of severity of condition. Dr. Lewis was of the opinion that almost every psychiatric condition reflects a lifelong personality structure, however, rather than something resulting from a specific event in adult life. These conditions profit from treatment although antisocial personality is especially difficult to treat successfully. It is not especially useful to distinguish the conditions for purposes of treatment. There are, however, practical necessities for distinctions in determining com-pensability, legal responsibility and competence to manage one’s affairs and moneys.
37. Plaintiff’s expert, Dr. Guttmacher, examined plaintiff briefly on May 27, 1959, the day before trial. He read his medical records and the statement from the Hartford Board of Education referred to previously. It was his conclusion that plaintiff is suffering from paranoia schizophrenia. He was of the opinion that plaintiff’s early background behavior was consistent with paranoia schizophrenia, although he admitted that he could not base this opinion upon the Hartford school report, and that some of plaintiff’s actions indi *381 cated characteristics of an antisocial personality. On balance, however, he felt that the evidence subsequent to plaintiff’s schooling, including the clinical notes from the sick bay in Camp Pendleton up to the time of plaintiff’s hospitalization, the conclusion of the Perry Point Veterans Hospital in August 1958 and of Dr. Benjamin Pope in September 1958, and the absence of a criminal record, all supported his own conclusion. Dr. Guttmacher was of the further opinion that plaintiff’s condition was mislabeled as antisocial personality in 1953 and that if the picture presented to him in 1959 had been presented to the survey board in 1953 it would have been unreasonable in its diagnosis of antisocial personality. He does not know what the board considered other than the threats plaintiff allegedly made and which he said are not characteristic of either of the conditions in issue. In reply to the question of how long plaintiff has been under the disability of schizophrenia, Dr. Guttmacher replied: “It would be my opinion that the condition manifested itself when he was in the service. Now, as to whether it manifested itself at any time before being in the service, I don’t have enough data here,- I can’t possibly express an opinion about that now.”
38. Dr. Guttmacher’s prognosis was that while plaintiff’s condition was moderate in 1959 it could easily become sufficiently aggravated to make prolonged hospitalization necessary, that it would be difficult to treat plaintiff, and that plaintiff’s megalomaniacal attitude about his abilities makes it almost certain that he will meet frustrations which he is poorly equipped to meet and which will thus aggravate his condition.
39. Dr. Lewis, defendant’s expert, examined the same materials as Dr. Guttmacher but did not examine plaintiff. He said he could not base a diagnosis on the information available to him but gave it as his opinion from these materials and plaintiff’s testimony that he was, at the time of the trial, an antisocial personality and not a paranoid schizophrenic. He admitted that plaintiff’s case was not a clear-cut one between these two conditions and that to conclude that plaintiff was presently suffering from paranoia schizophrenia would not be unreasonable. He did think, however, that plaintiff’s condition was neither caused nor aggravated by *382 military service, but predated it. He felt the decision of the board in 1953 was proper on the basis of information before it at the time and that the board’s diagnosis was supported in its report. The mere fact that years later the condition might be more serious or develop into something else would not, in his opinion, invalidate the well-documented findings of the board in 1953.
40. Dr. Lewis was of the opinion that the following supported the diagnosis of the Board of Medical Survey in 1953: plaintiff’s characteristic of always being in trouble as shown by his difficulties in school and his multiple infractions of military discipline; the Hartford school’s recommendation in 1949 that plaintiff have psychiatric attention and therapy; the results of the 1949 school examination showing marked signs of blocking and that plaintiff could function best in a solitary situation; plaintiff’s poor work habits; difficulties with other children; fear of being teased and picked on; competition with his sister; sensitive feelings about failures; poor achievement; functioning below the level of his intelligence; the notation by Dr. Lacerva in 1958 at Perry Point that plaintiff was a “very verbose antisocial personality”; the notation by Dr. Grasberger in 1958 that plaintiff’s difficulties were precipitated by increased responsibilities of marriage and birth of a child, the same being civilian problems; and the findings of Dr. Pope that plaintiff had shown aggressive and antisocial behavior. Dr. Lewis also noted characteristics indicative of schizophrenia such as autism, blocking, inappropriate affect, delusions and distress. Dr. Lewis noted little if any change between plaintiff’s pre-service, service and post-service condition and indicated that the school report of 1949 contains remarks which parallel in some respects those made in the clinical notes at the hospital at Camp Pendleton in 1953.
41. There is no evidence that plaintiff sustained damages in the amount of $25,000, as alleged in the petition.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition therefore is dismissed.